REVISED, April 6, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 99-50612**

---

**DANIEL D. MCINNIS,**

**Plaintiff-Appellant,**

**VERSUS**

**ALAMO COMMUNITY COLLEGE DISTRICT,**

**Defendant-Appellee.**

---

Appeal from the United States District Court
For the Western District of Texas

March 20, 2000

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.
DeMOSS, Circuit Judge:

D. Dwain McInnis ("McInnis") appeals from the final judgment entered by the district court, Magistrate Judge Pamela Mathy presiding, which granted summary judgment to the defendant Alamo Community College District ("ACCD") on his claims brought pursuant to the Americans With Disabilities Act. The magistrate judge granted summary judgment after concluding that McInnis failed to establish a prima facie case of discrimination under the ADA since he neither was, nor was regarded as being, disabled, and alternatively that ACCD had presented a legitimate, non-

discriminatory reason for terminating his employment which he failed to establish was a mere pretext for intentional discrimination. Because we find that there remain genuine issues as to the material facts in this case, we vacate the order of the magistrate judge granting summary judgment in favor of ACCD, and remand for further proceedings.

## I.   BACKGROUND

In 1975, McInnis suffered a severe closed head injury when he was involved in an automobile accident. After a period of rehabilitation, McInnis was able to return to work full time and has not received any physical therapy since approximately 1980. His resulting permanent impairments include slurred speech, walking with a limp, a language communication disorder, and partial paralysis of his right side. According to McInnis, these impairments have substantially limited the major life activities of walking, speaking, communicating, and performing some manual tasks.

After having first worked for several banks and bank holding companies in Beaumont, Texas, McInnis was hired on January 11, 1988 as part of Palo Alto College's ("PAC") full-time faculty. His job duties included both classroom instruction and coordinating a joint program sponsored by the American Institute of Banking ("AIB") and PAC. During his employment, McInnis concedes that he did not feel the need for, nor did he request any, "reasonable accommodation" for his impairments. And there is no dispute as to McInnis's qualifications to perform the essential functions of his position

2

as a business administration instructor.

At some point in June 1992, McInnis was moved from his position as coordinator of the AIB/PAC banking program to a full-time teaching position. Brian Skinner, who was then president of PAC, drafted an un-dated letter in which he provided McInnis with the reasons for his transfer. He stated that "first, the banking program was not functioning well and, secondly, you had a handicap that may have contributed to this problem. You were put into teaching to provide 'reasonable accommodation.'"[1]

At some point during his employment as a teacher, a student complained to Department Chair John Schlegel, who relayed the oral complaint in writing to Judith Cardenas, the acting Dean of the Business and Applied Science Department, that McInnis was intoxicated in class. Schlegel recommended investigation since the student who was a trained nurse observed McInnis's slurred speech, unsteady gait, blood-shot eyes, and pauses during his lecture. In his memorandum, Schlegel also indicated that he believed the student's impression may have been based upon a misperception regarding McInnis's disability since her report focused, and was based primarily upon, his unsteady gait and slurred speech.

The record contains three letters which were sent from AIB to ACCD regarding McInnis's performance as banking program coordinator. The first, dated June 10, 1991, was sent by Amanda Talaat, executive director of AIB, to the Dean of the

---

[1] The Americans With Disabilities Act went into effect on July 26, 1992, approximately one month following McInnis's "accommodation."

3

Occupational/Technical Education Department at PAC. The letter related AIB's concerns about the program and the belief that the problems were related to McInnis. The second, dated April 15, 1992, was sent by Peggy Walker, chairman of the AIB board, to John Schlegel, the Business and Applied Science Department Chair. That letter stated that McInnis should not continue as director because of his problems with "oral communication." The third, dated November 19, 1993, was drafted by William Goetz, chairman of the AIB board in San Antonio, to Dr. Joel Vela, the new President of Palo Alto College (Vela was hired in May, 1993). That letter noted a marked improvement in the AIB/PAC banking program after McInnis had been removed and stated that AIB would rethink its relationship with PAC if McInnis were returned to the position of coordinator. Ms. Talaat testified that the third letter was prepared at the request of ACCD, more than one year after McInnis was removed from the coordinator position, because Dr. Vela "needed it."

The decision to renew McInnis's teaching contract in 1993 was vested in Vela, the new president of PAC. On November 22, 1993, Vela informed McInnis by letter that his contract would not be renewed beyond December 31, 1993. His termination date, however, was subsequently extended to the end of the Spring semester of 1994. Despite this letter, the committees in charge of promotion and tenure recommended to Vela that McInnis be both promoted and granted tenure. Notwithstanding the committees' recommendation, Vela recommended to the Chancellor, who in turn recommended to the ACCD Board of Trustees, that McInnis receive neither a promotion

4

nor tenure. Predictably, he got neither. Vela stated in his deposition that there were two reasons why he did not want to renew McInnis's contract: (1) the November 19, 1993 letter addressed to him from AIB, and (2) the allegation that McInnis taught a class while intoxicated.

On January 13, 1994, McInnis filed a charge of discrimination with the EEOC, alleging that he had been discriminated against on the basis of a perceived disability when his employment contract was not renewed. McInnis received a right to sue letter from the EEOC, and the present lawsuit resulted.

As noted above, the magistrate judge concluded that McInnis failed to establish a prima facie case of discrimination under the ADA since he neither was nor was regarded as disabled. In the alternative, the magistrate judge concluded that ACCD had presented a legitimate, non-discriminatory reason for terminating McInnis's employment, which he failed to establish was a mere pretext for intentional discrimination. McInnis timely appealed.

## II. DISCUSSION

We review the grant of summary judgment *de novo*, applying the same standards as the district court. *See* **Sherrod v. American Airlines, Inc.**, 132 F.3d 1112, 1119 (5th Cir. 1998). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate only if

> . . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

5

> material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

A fact is material if it could affect the outcome of the lawsuit, and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See **Anderson v. Liberty Lobby, Inc.**,* 106 S. Ct. 2505 (1986). In reviewing all of the evidence, courts must look at the evidence and draw all inferences therefrom in a light most favorable to the non-moving party. *See **Hibernia Nat'l Bank v. Carner**,* 997 F.2d 94, 97 (5th Cir. 1993). Thus, we review all of the evidence in this case in a light most favorable to McInnis, drawing all reasonable factual inferences therefrom and making all credibility determinations related thereto in his favor.

## 1. The Prima Facie Case of Discrimination.

This being a case brought under the Americans With Disabilities Act where only circumstantial evidence is offered to show the alleged unlawful discrimination, we apply the **McDonnell Douglas**, Title VII burden-shifting analysis. *See **Daigle v. Liberty Life Ins. Co.**,* 70 F.3d 394, 396 (5th Cir. 1995) (*citing **McDonnell Douglas Corp. v. Green***, 93 S. Ct. 1817, 1824 (1973)). Under this framework, a plaintiff must first make a *prima facie* showing of discrimination by establishing that: (1) He is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably

than non-disabled employees.  *See **Burch v. Coca-Cola Co.***, 119 F.3d 305, 320 (5th Cir. 1997), *cert. denied* 118 S. Ct. 871 (1998).  Once the plaintiff makes his *prima facie* showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Once the employer articulates such a reason, the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination.  *See **Daigle***, 70 F.3d at 396.

As noted above, the threshold element of a *prima facie* showing of discrimination under the ADA is a showing that the plaintiff either is, or is regarded as being disabled.  Failure to establish an actual or perceived disability is thus fatal to a plaintiff's case.  The magistrate judge based her conclusion that McInnis failed to set forth a prima facie case of ADA discrimination on two sub-determinations: (1) that McInnis was neither actually disabled nor regarded as disabled; and (2) that he was not terminated on account of the alleged disability or perception of disability.  We confine our consideration of this case to those two issues.

**A.  Is McInnis either disabled or "regarded as" disabled?**

The magistrate judge properly identified the relevant standards for defining and determining when one is disabled under the ADA.  A "disability" under the ADA is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; a record of such

impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102. A "major life activity," as defined by the EEOC regulations includes such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2. And one is "substantially limited' in a major life activity if he is:

> (i) [u]nable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2. Furthermore, an individual may be "regarded as disabled" if he has a physical or mental impairment that does not substantially limit major life activities but nonetheless is treated by a covered entity as constituting such a limitation. *See id.*

With respect to whether McInnis is actually disabled, we note that the analysis of whether a plaintiff's claimed impairment interferes with a major life activity in such a substantial way as to constitute a disability requires an individualized inquiry. *See Sutton v. United Air Lines, Inc*, 119 S. Ct. 2139, 2147 (1999). ACCD argues that McInnis has failed to articulate with specificity any substantial limitation of his ability to perform everyday activities, and that what he has alleged is only mild difficulty in walking, speaking, and performing manual tasks. ACCD notes that

8

McInnis claims only that, as a result of an automobile accident, he has somewhat slurred speech (which he calls an expressive language disorder ("ELD")), a slight limp which is exaggerated when he is fatigued, and stiffness and fatigue in his hands which prohibit him from properly forming script letters. ACCD also notes that when provided an opportunity to disclose any physical limitations that would affect his ability to perform his job functions on his employment application, he responded "none."

ACCD cites several cases in support of its contention that the mild impairments suffered by McInnis do not rise to the level of "disability" under the ADA. *See* **Talk v. Delta Air Lines, Inc.**, 165 F.3d 1021, 1022-1025 (5th Cir. 1999); **Deas v. River West, L.P.**, 152 F.3d 471, 480 n.2 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 2392 (1999); **McGraw v. Sears, Roebuck & Co.**, 21 F.Supp.2d 1017, 1021 (D. Minn. 1998). However, as noted above, disability determinations must be made on a case-by-case basis, without strict categorical reliance on disability determinations made in prior cases as establishing *per se* disability or non-disability. *See* **Sutton**, 119 S. Ct. at 2147.

In the circumstances of this case, we need not reach the issue of whether McInnis was actually disabled because, even if he does not suffer from an "actual" disability, McInnis may still recover if his employer "regards" him as being disabled. As will be discussed below our review of the record of this case leads us to conclude that there remains a genuine factual issue as to whether McInnis was "regarded as" disabled by his employer.

9

In order to be "regarded as" disabled a plaintiff must: (1) have a physical or mental impairment that does not substantially limit major life activities, but be treated as such by an employer; (2) have a physical or mental impairment that substantially limits one or more major life activities, but only because of the attitudes of others toward the impairment; or (3) have no actual impairment at all, but be treated by an employer as having a substantially limiting impairment. *See* **Sherrod**, 132 F.3d at 1121. The plaintiff also must establish that the impairment, if it existed as perceived, would be substantially limiting. *See* **Deas**, 152 F.3d at 476.

McInnis appropriately relies on the testimony of ACCD's ADA compliance coordinator that she could tell from his file that he was either disabled or perceived as disabled by ACCD. Perhaps understandably, ACCD fails to address this damaging testimony in its brief. McInnis also relies on former President Skinner's letter in which he told McInnis that his transfer was an "accommodation" for his "handicap." ACCD counters that Skinner was not a decision maker in the adverse employment action taken against McInnis (contract non-renewal), that the statement was made prior to enactment of the ADA,[2] and that there is no evidence that

---

[2] ACCD's argument here is suspect. ACCD is correct that the ADA was not made retroactive, but there is no support for the conclusion that pre-ADA activities cannot be used as evidence that a plaintiff was "regarded as" disabled. Rather, the non-retroactivity of the ADA merely removes adverse employment actions taken prior to enactment from the scope of the statute.

10

Skinner understood the legal meaning of the terms "handicap" and "reasonable accommodation."

ACCD also argues that merely because it may have been aware of a disability, that does not require a finding that it "perceived" McInnis as disabled. And according to ACCD, there is no evidence that President Vela or anyone whom he consulted prior to deciding not to renew McInnis's contract viewed McInnis as being substantially limited in any major life activity.

McInnis argues that he need only establish that he was regarded as unable to perform or significantly restricted in performing a major life activity (speech). He argues that the reasonable accommodation provided by Skinner in transferring him to teaching only was to allow him to perform his essential job functions *in spite of* his disability (that is, his substantially limited major life activity of speech).

Construing all of the evidence and factual inferences in favor of McInnis, especially the testimony of ACCD's own ADA compliance coordinator, and irrespective of whether he suffered an actual disability, there is ample evidence from which a reasonable jury could find that ACCD perceived or regarded McInnis as disabled because he was substantially limited in his major life activity of speaking.

**B. Was McInnis terminated "because of" his disability?**

In order to make his *prima facie* showing of discrimination, McInnis must also establish that he was terminated "because of" his

disability. Here the undisputed evidence is that the stated reasons given by Vela for not renewing McInnis's contract (effectively terminating him) were two-fold: (1) a student's allegation of intoxication in the classroom; and (2) concerns over his poor performance as banking coordinator.

Neither of these two reasons is supported by the record of this case. By its own admission in its supplemental position statement to the EEOC, ACCD stated that "the only allegation related to a 'disability' [the memorandum regarding a student allegation of intoxication while teaching] was investigated and summarily dismissed." The relied upon complaints about McInnis's job performance as AIB/PAC program coordinator were stale, as he transferred to a new position as a teacher some one and a half years prior to ACCD's decision not to renew his contract, and McInnis received only outstanding performance reviews as an instructor during the one and a half years preceding his termination. Moreover, both of the reasons given for McInnis's termination are entirely related to and predicated upon his perceived disabilities. He was in effect terminated for his poor performance as banking coordinator, and his poor performance resulted from his disability or perceived disability. Likewise, the intoxication allegation had, by ACCD's own admission, been summarily dismissed as caused by the symptoms of his disability.

McInnis states that he was "a disabled employee performing in an outstanding fashion under a reasonable accommodation [who] was terminated as a direct consequence of the symptoms of his

12

disability." Construing all of the evidence in a light most favorable to McInnis, we find that a reasonable jury could have agreed with McInnis's statement and concluded from the evidence presented that McInnis was terminated because his employer regarded him as disabled. We therefore conclude that McInnis has sustained his initial burden of establishing a prima facie case of unlawful disability based discrimination.

### 2. Reasonable Inference of Discrimination

As noted above, under the **McDonnell Douglas** framework applicable to cases based on circumstantial evidence, once a plaintiff makes his *prima facie* showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. And once the employer articulates such a reason, the presumption of unlawful discrimination disappears and the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination. *See* **Daigle**, 70 F.3d at 396.

In **Rhodes v. Guiberson Oil Tools**, 75 F.3d 989, 994 (5th Cir. 1996) (en banc), we held that in order to sustain a finding of discrimination, "circumstantial evidence must be such as to allow a rational factfinder to make a reasonable inference that [disability] was a determinative reason for the employment decision." *Id.* With respect to creating such an inference, we held in **Rhodes** that "a jury issue will be presented and a plaintiff

13

can avoid summary judgment . . . if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [disability] was a determinative factor in the actions of which plaintiff complains." *Id.*

McInnis contends that he has satisfied his burden under *Rhodes*. First, he argues that the summary judgment evidence created establishes that ACCD's two proffered reasons for not renewing his contract were neither legitimate, nor non-discriminatory; he argues that he was terminated for reasons directly related to the symptoms of his disability. Second, McInnis argues that there is ample evidence to establish a reasonable inference that his perceived disability was a determinative factor in the decision not to renew his contract.

While the reasons advanced by ACCD for termination (intoxication and poor performance as banking coordinator), may be facially legitimate, we express doubt as to whether they are non-discriminatory. As noted above, neither of the reasons are supported by the record evidence. That is, ACCD conceded that the intoxication allegation was summarily dismissed, and it relied upon complaints about McInnis's poor performance as the AIB/PAC program coordinator which were stale by more than one and a half years without regard to his notably improved performance once transferred to a teaching only position. In our view, there was sufficient evidence presented to create a fact issue as to whether ACCD's

14

stated reasons were what actually motivated the decision to not renew McInnis's contract.

Our review of the record also reveals ample evidence from which a reasonable jury could conclude that ACCD's proffered reasons were nothing more than a pretext for unlawful discrimination based upon McInnis's perceived disability. The following is the evidence proffered by McInnis, which when construed in his favor, supports an inference of discrimination: (1) contradictions between Department Chair Schlegel and President Vela regarding whether they discussed McInnis and the intoxication allegation; (2) contradictions regarding the disposition of the intoxication allegation (summarily dismissed or active complaint serving as primary reason for termination); (3) ACCD's report to the EEOC which it confessed contained false statements regarding committee recommendations on tenure; (4) the admission by Vela that he knew the EEOC statements were false when they were made yet he did nothing to correct them; (5) ACCD's denial that it ever accommodated McInnis's disability versus the statement of then-President Skinner to the contrary; (6) Ms. Talaat being requested by Vela out of the blue to prepare a letter criticizing McInnis's earlier performance in a position he no longer held so that the letter could be used as a "trigger" only days later to terminate McInnis;[3] (7) the sworn contradictions between ACCD's EEO manager

---

[3] This fact seems most damning of pretext as Ms. Talaat specifically stated that she was asked to prepare the letter complaining about McInnis some one and a half years after he had been removed from that position because Vela "needed it."

15

and its ADA coordinator regarding conversations about McInnis and the reasons for his termination; and (8) the testimony of the ADA coordinator that she was asked by the EEO manager to destroy documents which might hurt ACCD's position.

ACCD argues that Dr. Vela, the decision-maker in this scenario, was unaware of McInnis's file, his disability, or Skinner's alleged accommodation thereof. Thus, ACCD argues that right or wrong, for all Vela knew, McInnis was still the banking coordinator who performed poorly in the past and who had appeared for a class intoxicated. Yet we find that Vela's "ignorance" is suspect in light of the evidence that he solicited the third complaint letter from Ms. Talaat specifically to build a case for firing McInnis and that he made no effort to validate the intoxication complaint before making his non-renewal decision. We note that the student's misperception as to McInnis's intoxication was acknowledged as being related to his disability when in its EEOC response, ACCD acknowledged that her perceptions were disability related and affirmatively represented that the complaint had been summarily dismissed in order to diminish the effects of the complaint. However, Dr. Vela stated later that this admittedly "disability related misperception" formed half of the basis for his decision to take adverse action against McInnis.

We conclude that McInnis has put forth evidence which a reasonable jury could use to determine that the true, driving reason for not renewing McInnis's contract was impermissible discrimination based on his actual or perceived disability. Thus,

16

we also conclude that the magistrate judge erred in finding as a matter of law that McInnis failed to create a genuine issue of material fact as to that issue. A reasonable jury, viewing all of the evidence in a light most favorable to McInnis, could certainly resolve these matters in his favor. As such, and thus, summary judgment was improvidently entered against him.

### III. CONCLUSION

For all of the foregoing reasons, we **VACATE** the magistrate judge's order granting summary judgment in favor of ACCD and **REMAND** this cause for further proceedings consistent herewith.